UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| TONI T.[1], | ) |
| | ) |
|    Plaintiff, | ) |
| | ) |
| v. | )   CIVIL NO. 2:20cv420 |
| | ) |
| KILOLO KIJAKAZI, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
|    Defendant. | ) |

## OPINION AND ORDER

     This matter is before the court for judicial review of a final decision of the defendant Commissioner of Social Security Administration denying Plaintiff's application for a period of disability and for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. § 423(d). Section 205(g) of the Act provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based.  The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing."  It also provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  42 U.S.C. §405(g).

     The law provides that an applicant for disability benefits must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of no less than 12

---

[1] For privacy purposes, Plaintiff's full name will not be used in this Order.

months. . . ." 42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

    1.    The claimant last met the insured status requirements of the Social Security Act

       on December 31, 2016.

2.     The claimant did not engage in substantial gainful activity during the period from her alleged onset date of October 1, 2011 through her date last insured of December 31, 2016 (20 CFR 404.1571 *et seq*.).

3.     Through the date last insured, the claimant had the following severe impairments: coronary artery disease, cervical and lumbar degenerative disc disease, hypertension, right shoulder joint dysfunction, migraine headaches, and peripheral neuropathy (20 CFR 404.1520(c)).

4.     Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.     After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to lift, carry, push, and pull ten (10) pounds occasionally and lesser weights frequently; stand and/or walk for up to two (2) hours of an eight-hour workday and sit for up to six (6) hours of an eight-hour workday; cannot crawl or climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs, balance, stoop, kneel, and crouch; cannot reach overhead and can frequently reach in all other directions; can occasionally work in vibration; cannot work at unprotected heights, in humidity and wetness, or in bright sunlight or bright flickering lights, such as would be experienced welding or cutting metals; is limited to working in environments with no more than a moderate noise level; and every 60 minutes, the person must be allowed to shift positions or alternate between sitting and standing for 1 to 2 minutes at a time, while remaining on task.

6.     Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.     The claimant was born on June 17, 1967 and was 49 years old, which is defined as a younger individual age 45-49, on the date last insured (20 CFR 404.1563).

8.     The claimant has at least a high school education (20 CFR 404.1564).

9.     Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568).

10.    Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in

       significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant was not under a disability, as defined in the Social Security Act, at any time from October 1, 2011, the alleged onset date, through December 31, 2016, the date last insured (20 CFR 404.1520(g)).

(Tr. 896-908).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to benefits, leading to the present appeal.

Plaintiff filed her opening brief on October 13, 2021. On November 24, 2021 the defendant filed a memorandum in support of the Commissioner's decision to which Plaintiff replied on December 8, 2021. Upon full review of the record in this cause, this court is of the view that the Commissioner's decision should be remanded.

A five step test has been established to determine whether a claimant is disabled. *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162

n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).   In the present case, Step 5 was the determinative inquiry.

Plaintiff filed an application for DIB on February 14, 2015, alleging disability beginning October 1, 2011. (Tr. 68). The Disability Determination Bureau (DDB) denied Plaintiff's claims on June 18, 2015. (Tr. 92). Plaintiff requested reconsideration but was again denied on July 31, 2015. (Tr. 97). Plaintiff filed a request for an administrative hearing on August 24, 2015. (Tr. 102). On April 17, 2017, Plaintiff appeared for a hearing before ALJ Kevin Plunkett. (Tr. 125-129). On June 2, 2016, ALJ Plunkett issued an unfavorable decision, concluding Plaintiff's impairments permitted the performance of other work. (Tr. 14-35). Plaintiff filed a request for review by the Appeals Council, but the Appeals Council denied her request for review on July 5, 2018.  Plaintiff then timely filed a complaint with this Court. The Court remanded Plaintiff's case to the Social Security Administration on December 16, 2019.[2]  ALJ Marc Jones held a telephonic remand hearing on July 8, 2020. On July 24, 2020, ALJ Jones issued an unfavorable decision. Plaintiff then timely filed the present appeal.

Plaintiff was born on June 17, 1967. (Tr. 68). At the time of her filing date, Plaintiff was 48 years old. Plaintiff completed the 12th grade. (Tr. 76). She worked in the past as a machine packager. (Tr. 29).

On February 25, 2015, Plaintiff reported to cardiologist Dr. Anas Safadi due to chest pains. (Tr. 490). After examination, Dr. Safadi diagnosed Plaintiff with coronary artery disease and ST elevation myocardial infarction. (Tr. 491). Given the symptoms, Plaintiff decided to have a heart catheterization. (Tr. 401).

---

[2] Civil No. 2:18cv332-PPS-SLC.

On March 3, 2015, Plaintiff received an MRI of her lumbar spine due to low back pain. (Tr. 344-45). The MRI revealed the following impressions:

> Mild bulging of the L2-L3 disc is noted.  A superimposed, slightly extruded left paracentral disc herniation is identified with compression of the thecal sac in the left lateral recess.  However, no compression of the nerve roots is noted.
>
> Bulging of the L3-L4 disc is noted.  A left annular tear is noted.  However, no compression of the nerve roots is noted.
>
> Bulging of the L4-L5 disc is noted.  A small superimposed left lateral disc herniation is noted with mild effacement of the exiting left L4 nerve within the foramen.  There is no significant central canal or foraminal stenosis.
>
> Bulging of the L5-S1 disc is noted.  A superimposed, slightly extruded left paracentral disc herniation is noted with slight caudal extension of disc material posterior to the S1 vertebral body.  There is effacement of the thecal sac in the left lateral recess as well as the origin of the left S1 nerve root.  In addition, there is a left lateral L5-S1 disc herniation with effacement of the exiting left L5 nerve root within the foramen.

On March 16, 2015, Plaintiff presented to orthopedic surgeon Dr. Donald Kucharzyk due to lower back pain (Tr. 676). Throughout the examination, Plaintiff presented with a limp and antalgic gait. (Tr. 679). Dr. Kucharzyk noted tenderness at the iliac crest, posterior superior iliac spine, paraspinal region, and pain with motion. (Tr. 679). Plaintiff exhibited diminished left ankle reflex and decreased sensation of the lateral leg and dorsum of the foot. (Tr. 679). She lacked some motor strength in the great toe extension extensor hallucis longus and plantar flexion gastrocnemius. (Tr. 679). After examination, Dr. Kucharzyk diagnosed Plaintiff with lumbosacral spondylosis, spinal stenosis, arthropathy of lumbar facet joint, displacement of lumbar intervertebral disc, and lumbar spine instability. (Tr. 680). Dr. Kucharzyk ordered an MRI, prescribed Medrol dose pack, followed by Mobic and Soma. (Tr. 680).

On April 31, 2015, Plaintiff returned to Dr. Kucharzyk. (Tr. 681). Plaintiff no longer had a

painful gait but her gait had become wide-based and flexed at the hips and knees. (Tr. 684). Dr. Kucharzyk noted tenderness of the spinous process at L5, iliac crest and posterior superior iliac spine, supraspinous ligament, iliolumbar region, supraspinous ligament, paraspinal region at L5, iliolumbar region. (Tr. 684). The recent MRI revealed spondylosis with end plate changes. (Tr. 685). Dr. Kucharzyk diagnosed Plaintiff with spinal stenosis, lumbosacral spondylosis, arthropathy of lumbar facet joint, lumbar spine instability, low back pain, and displacement of lumbar intervertebral disc. (Tr. 685). Dr. Kucharzyk gave her home exercises to do and referred her to physical therapy. (Tr. 685).

On June 8, 2015, Plaintiff presented to internist Dr. M. Siddiqui for a physical consultative examination as requested by the Social Security Administration. (Tr. 667-669). Plaintiff could get on and off the examining table but had some difficulty doing so. (Tr. 668). Her straight leg test was positive bilaterally at 30 degrees and revealed lower back pain. (Tr. 668). She had limited range of motion of the lumbosacral spine. (Tr. 668). With some difficulty, Plaintiff could walk on heels and toes. (Tr. 668). She also struggled with squatting. (Tr. 668). After examination, Dr. Siddiqui diagnosed her with migraine headaches, neck pain with radiculopathy, coronary artery disease, high blood pressure, and osteoporosis. (Tr. 669).

On September 2, 2015, Plaintiff reported to Franciscan Alliance Emergency Room due to lower back pain. (Tr. 782). Upon examination, the hospital noted mild paraspinal tenderness on palpation to right lower lumbar area. (Tr. 784). They diagnosed her with sciatica and treated with Diclofenac, Dexamethasone, Orphenadrine. (Tr. 785).

On October 6, 2015, Plaintiff received a nerve conduction and EMG test which revealed evidence for peripheral neuropathy in the lower extremities. (Tr. 735).

7

On October 12, 2015, Plaintiff reported to pain management physician Dr. Rajive Adlaka due to her lower back and neck pain. (Tr. 732). Upon examination, Dr. Adlaka noted decreased range of motion in Plaintiff's lumbar spine. (Tr. 733). Dr. Adlaka diagnosed Plaintiff with over intervertebral disc degeneration and postlaminectomy syndrome, and lumbar radiculopathy. (Tr. 733). They discussed possibly doing injections, which Plaintiff declined. (Tr. 733).

On October 26, 2015, neurologist Dr. Richard Cristea filled out a medical source statement regarding Plaintiff's headaches. (Tr. 742). He opined that Plaintiff suffered severe chronic migraines. (Tr. 742). Associated symptoms included nausea, vomiting, photophobia, throbbing pain, inability to concentrate, phonophobia, visual disturbances, and impaired appetite. (Tr. 742). The inability to concentrate would cause an "off task" percentage of twenty-five percent or more during work. (Tr. 744). Activity, bright lights, and noise worsened the migraines. (Tr. 743). The migraines happened every day. (Tr. 742). The migraines lasted anywhere from six to twelve hours. (Tr. 742). Triggers for these migraines included alcohol, bright lights, food, stress, and weather changes. (Tr. 743). To combat these migraines, Plaintiff needed to take her medication, lie down in a quiet dark place, and use cold packs. (Tr. 743). Due to the correlation of stress and migraine severity, Plaintiff could work a "low stress" job at the most. (Tr. 743). Despite treatment with botox injections and medications, during a normal work day, six to eight times a month Plaintiff would require unscheduled breaks due to her migraines. (Tr. 744). The break would have to include the rest of the day after a migraine incident. (Tr. 744). Her migraines would cause her to miss more than four days of work per month. (Tr. 744). Her medications also caused side effects which included fatigue and muscle spasms. (Tr. 744). Dr. Cristea concluded, "...unable to work at all during times of migraine." (Tr. 745).

8

On November 19, 2015, Plaintiff returned to Dr. Kucharzyk due to "l-spine problem." (Tr.746). Throughout the examination, Plaintiff exhibited an antalgic gait, limping while she ambulated. (Tr. 749). Upon examination, Dr. Kucharzyk noted tenderness of the spinous process at L5, transverse process at bilateral L5, posterior superior iliac spine, sacroiliac joint, paraspinal region at L4, iliolumbar region, and gluteus maximus. (Tr. 749). Plaintiff exhibited a limited range of motion at the lumbar spine, and pain occurred upon each movement. (Tr. 749). She had a diminished left ankle reflex, decreased sensation on the lateral leg, posterior leg, dorsum and sole of the foot. (Tr. 740). Her compression test, femoral nerve traction, supine straight leg raising test, and seated straight leg raising test returned positive. (Tr. 749). After examination, Dr. Kucharzyk diagnosed Plaintiff with arthropathy of lumbar facet joint, lumbar spine instability, spinal stenosis, lumbosacral spondylosis with radiculopathy, and internal disc disruption. (Tr. 750). Dr. Kucharzyk opined that Plaintiff was a candidate for "MIS PSF." (Tr. 751). However, she needed to consult her cardiologist so she could go off her blood thinner for the surgery. (Tr. 751).

On November 25, 2015, Plaintiff presented to Dr. Safadi for a pre-operation cardiology exam. (Tr. 803). Since the surgery was not dire, Dr. Safadi advised her to a wait at least a year from her stent placement, which occurred February 2015. (Tr. 805). Thereafter, she could stop taking Brilinta a week before the procedure. (Tr. 805).

On March 16, 2016, Plaintiff returned to Dr. Safadi due to worsening shortness of breath and chest pain. (Tr. 812). After examination, Dr. Safadi diagnosed Plaintiff with unspecified chest pain, coronary artery disease, and unspecified artery myocardial infarction. (Tr. 813). Dr. Safadi ordered a nuclear stress test and switched Plaintiff's Brilinta prescription to Effient. (Tr. 813).

On June 8, 2016, Plaintiff reported to Dr. Safadi due to leg pain and muscle aches. (Tr.

9

829). After examination, Dr. Safadi diagnosed Plaintiff with coronary artery disease and unspecified artery myocardial infarction. (Tr. 830). Due to the leg pain and muscle aches, Dr. Safadi decreased Plaintiff's Lipitor dosage. (Tr. 830). If this helped Plaintiff's pain, he would prescribe Praluent. (Tr. 830).

On November 29, 2016, Plaintiff presented to Dr. Kucharzyk due to cervical and shoulder pain. (Tr. 871). Plaintiff exhibited a limited range of motion in her neck. (Tr. 873). Upon examination, Dr. Kucharzyk noted tenderness of the coracoid process, acromioclavicular joint, acromial, greater tuberosity, bicipital groove, subacromial bursa, subdeltoid bursa, and lateral cuff insertion. (Tr. 873). She had positive Tinel's, Phalen's, Flick's, and median nerve compression sign. (Tr. 873). Dr. Kucharzyk diagnosed Plaintiff with derangement of shoulder, rotator cuff syndrome, and carpal tunnel syndrome. (Tr. 873-74). He ordered an MRI of the right shoulder, an EMG, and a DEXA scan. (Tr. 873). Dr. Kucharzyk prescribed her a Medrol dose pack and Naprosyn. (Tr. 873).

On December 9, 2016, Plaintiff received a DEXA scan due to possible osteopenia. (Tr. 843). The DEXA scan was consistent with osteopenia. (Tr. 843).

On December 10, 2016, Plaintiff received a MRI of her right shoulder due to pain and limited range of motion. (Tr. 842). The MRI revealed prominent arthritic changes of the "AC joint" and "questionable superior labral tear with tearing of the posterior inferior labrum suspected as well." (Tr. 842).

On December 20, 2016, Plaintiff reported to Dr. Kucharzyk due to shoulder pain. (Tr. 860). Upon examination, Dr. Kucharzyk noted limited range of motion in the cervical spine. (Tr. 862). Tenderness occurred in the coracoid process, acromioclavicular joint, acromial, greater

10

tuberosity, bicipital groove, subacromial bursa, subdeltoid bursa, lateral cuff insertion. (Tr. 862). She had a positive Hawkin's, Neer's, O'Brien's, Speed's, Empty Can Sign, and Yergason's tests were positive. (Tr. 862). She also had positive Tinels, Phalens, Flick, and median nerve compression sign. (Tr. 862). Dr. Kucharzyk diagnosed Plaintiff with derangement of shoulder, rotator cuff syndrome, and impingement syndrome of shoulder region. (Tr. 863). He gave her right subacromial space aspiration and a cortisone injection into the subacromial space. (Tr. 862).

On February 8, 2017, Plaintiff returned to Dr. Kucharzyk due to shoulder pain. (Tr. 858). Plaintiff reported the injection to her right shoulder did help some. (Tr. 858). Upon examination, Dr. Kucharzyk noted limited range of motion in the cervical spine, tenderness of the acromial and subacromial bursa. (Tr. 859). With extreme movement in active and passive range of motion to her shoulder, it caused some pain. (Tr. 859). She scored a positive Tinel's, Phalen's, and Flick's test. (Tr. 859). Median nerve compression was also noted. (Tr. 859). Dr. Kucharzyk diagnosed her with derangement of the shoulder, rotator cuff syndrome, and impingement syndrome of right shoulder. (Tr. 859). He advised Plaintiff to continue home exercises, and if the symptoms worsened, he would give her another injection. (Tr. 859).

On March 31, 2017, Dr. Kucharzyk filled out a lumbar spine medical assessment statement. (Tr. 877). He opined that Plaintiff exhibited pain from a failed back surgery and instability. (Tr. 877). Her symptoms affected her back and both her legs, including pain, limited range of motion, and weakness. (Tr. 877). She had positive straight leg test: left leg at thirty degrees and right leg at forty-five degrees. (Tr. 878). Symptoms she exhibited included abnormal gait, sensory loss, reflex changes, back tenderness, back crepitus, back swelling, back muscle spasm, lower extremity muscle atrophy, back and lower extremities muscle weakness. (Tr. 878).

11

Due to her symptoms, she had difficulties sleeping. (Tr. 878). Plaintiff could only sit for fifteen minutes and stand for ten minutes. (Tr. 878). In a total eight hour work day, Plaintiff could sit, stand and or walk for less than two hours. (Tr. 878). During an eight hour work day, she would need five minutes of walking every fifteen minutes. (Tr. 879). She could rarely lift ten pounds or climb stairs, but she could never twist, stoop, crouch, and climb ladders. (Tr. 879). With prolonged sitting, her feet required elevation of two feet. (Tr. 879). Plaintiff would require unscheduled breaks throughout the day at approximately every thirty to sixty minutes. (Tr. 879). These breaks would need to last anywhere from fifteen to thirty minutes. (Tr. 879). She would be off-task twenty five percent of the time or more. (Tr. 880). Each month, Plaintiff would miss four or more days. (Tr. 880). Dr. Kucharzyk felt that Plaintiff was incapable of even "low stress" work due to the effects it would have on her back and shoulders. (Tr. 880).

In support of remand, Plaintiff first argues that the ALJ's conclusions regarding her ability to reach, lift, and carry are unsupported by substantial evidence. Plaintiff contends that the ALJ impermissibly interpreted medical evidence on his own and substituted his lay opinion to make the RFC determination. Plaintiff argues that the ALJ should have re-submitted Plaintiff's case to a medical expert due to her right shoulder MRI (Tr. 842) which occurred in December of 2016 after the state agency consultants had reviewed Plaintiff's medical evidence. The Commissioner, however, argues that the ALJ did not interpret Plaintiff's MRI but simply re-stated information from the medical records. (*See* Tr. 904). While the ALJ may not have explicitly interpreted the MRI results, the ALJ still did not have the benefit of a medical expert opinion in determining the limiting effects of Plaintiff's right shoulder impairments. This is a very important issue because, as Plaintiff points out, the shoulder limitations could potentially qualify Plaintiff for benefits.

12

Thus, remand is warranted for medical expert review of Plaintiff's shoulder MRI. *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014).

Plaintiff also argues that the ALJ gave improper weight to the opinion of her treating orthopedic surgeon, Dr. Kucharzyk. Plaintiff notes that the ALJ failed to mention a single one of the regulatory factors in deciding how much weight to assign Dr. Kucharzyk's opinion. The Commissioner counters that "[t]o the extent there is any error in not expressly stating these factors, it was harmless." As the Court is already remanding this case, this issue should also be remedied on remand. The Social Security Administration expects claimants to adhere to every letter of every regulation. It is only fair that this Court expect as much from the Administration.

Next, Plaintiff argues that the ALJ erred in his evaluation of whether Plaintiff's combined impairments met or equaled Listing 1.04, which covers disorders of the spine. At Step Three, an ALJ is required to determine whether the claimant meets or equals any of the listed impairments found in the Listing of Impairments. 20 C.F.R. Pt. 404, Subpt. P, Appendix 1. *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004); 20 C.F.R. § 404.1520(a)(4)(iii). For each listed impairment, there are objective medical findings and other specific requirements which must be met to satisfy the criteria of that Listing. 20 C.F.R. §§ 404.1525(c)(2)-(3), 416.925(c)(2)-(3). When a claimant satisfies all such criteria, that person is deemed presumptively disabled and entitled to benefits. *Barnett*, 381 F.3d at 668; 20 C.F.R. §§ 404.1525(a), 416.925(a), 404.1525(c)(3) and 416.925(c)(3). Even if a claimant's listed impairment does not satisfy each requirement of the specified elements of the listing, it can result in a finding of disability if the record contains "other findings related to [the] impairment that are at least of equal medical significance to the required criteria" or if "the findings related to [a combination of] impairments

13

are at least of equal medical significance to those of a listed impairment." 20 C.F.R. §§ 404.1526, 416.926. "In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Barnett*, 381 F.3d at 668.

 Here, the ALJ merely stated:

> The claimant does not meet Listing 1.04—*Disorders of the spine*, because the claimant's record does not reveal evidence of positive sitting and supine straight-leg raising tests, there is no operative note or pathology report confirming spinal arachnoiditis, and the claimant is able to ambulate effectively without the use of a walker, two crutches, or two canes.

(Tr. 898-99).

 Listing 1.04 requires compromise of a nerve root or the spinal cord with one of the following:

> (A) Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>
> (B) Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
>
> (C) Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04.

 Plaintiff asserts that the ALJ should have explored Listing 1.04A in more detail, and claims that she meets all of the criteria to meet Listing 1.04A. The parties disagree about the

14

conclusions to be derived from Plaintiff's March 2015 MRI, which was set out above in the discussion of the medical evidence. The Commissioner contends that the MRI does not show "evidence of nerve root compression". This is true with respect to the L2-L3 and L3-L4 discs. (Tr. 344). However, with respect to the L4-L5 disc it was noted that "[a] small superimposed left lateral disc herniation is noted with mild effacement of exiting left L4 nerve root within the foramen." Plaintiff cites the dictionary definition of "effacement" and concludes that effacement of a nerve root is a type of compromise "which may even exceed the severity of compression." Plaintiff further points out that the MRI results also state that, with respect to several discs, effacement of the thecal sac and compression of the thecal sac is noted. (Tr. 344-45). Plaintiff contends that this evidence would also satisfy the criteria of Listing 1.04A.

The Commissioner argues that the ALJ's finding is supported by the State agency physicians, J.V. Corcoran, M.D. and J. Sands, M.D., who reviewed the MRI findings in 2015 and found that Plaintiff did not meet Listing 1.04. This Court has carefully reviewed Drs. Corcoran and Sands reports. (Tr. 68-77, 79-90). While Listing 1.04 is mentioned (Tr. 73, 86) there is no actual discussion of the Listing or whether Plaintiff's symptoms/diagnoses met or equaled the Listing. Although the MRI results are quoted later in the reports (Tr. 75, 88) there is no discussion of the MRI (or any of the medical evidence) in relation to Listing 1.04.

Clearly, the ALJ should have reviewed this evidence more carefully to ascertain whether Plaintiff did, in fact, meet or medically equal Listing 1.04A. Plaintiff has raised important points regarding the MRI report, and these points should be carefully explored on remand.

15

## Conclusion

On the basis of the foregoing, the Decision of the Commissioner is hereby REVERSED AND REMANDED for further proceedings consistent with this Opinion.

Entered: December 16, 2021.

s/ William C. Lee<br>
William C. Lee, Judge<br>
United States District Court